**NOT FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

- - - - - - - - - - - - - - - - - - - - - - - - - -X
In re:

Richard Howard Glanton,                                    Chapter 7

                                                           Case No. 22-11055 (CMG)

                          Debtor.
- - - - - - - - - - - - - - - - - - - - - - - - - -X
Newport Investment Group, LLC                              Adv. Pro. No. 22-01388 (CMG)

                 Plaintiff,
v.

Richard Howard Glanton,

                 Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - -X

**OPINION**

**APPEARANCES:**

**Sari Blair Placona, Esq.**
**McManimon Scotland & Baumann, LLC**
Attorneys for Newport Investment Group, LLC

**Richard Howard Glanton**
Self-Represented Debtor/Defendant

**CHRISTINE M. GRAVELLE, U.S.B.J.**

**INTRODUCTION**

Debtor/defendant Richard Howard Glanton ("Glanton") moves to dismiss the adversary

complaint filed by plaintiff/creditor Newport Investment Group, LLC ("Newport CA" or

"Plaintiff") under Federal Rule of Civil Procedure 12.[1]    Through the adversary proceeding Newport seeks a determination that its claim against Glanton, obtained through the assignment of a California judgment (the "Judgment"), is not dischargeable under 11 U.S.C. § 523(a)(2)(A) & (B), (4), (6), and (19)(B).  It further seeks the denial of the issuance of a discharge to Glanton under 11 U.S.C. § 727(a)(2)(A) & (B), (3), (4)(A)-(D), (5), (6)(A), (7), (11), and (12)(B).

Glanton's motion to dismiss raises issues concerning Plaintiff's standing to bring this action and is jurisdictional.  Glanton alleges that: (1) the Judgment, which was ultimately assigned to Newport CA, and the assignment itself, were vacated, leaving Plaintiff with no direct claim against him; (2) a Montana entity also named Newport Investment Group, LLC ("Newport MT") received the initial assignment of Judgment at a time when Newport MT's status with the Secretary of State of Montana was "involuntarily dissolved;" and (3) even assuming the initial assignment was valid, at the time of the later assignment from Newport MT to Newport CA, Brian Roche ("Roche"), the signatory for Newport MT, was disassociated from Newport MT and had no power to act on its behalf.

After several rounds of briefing, two oral arguments, and an evidentiary hearing, the Court finds that Newport CA has the requisite standing to bring forth this action.  Glanton's motion to dismiss is DENIED.

## **Procedural History of the Adversary Proceeding**

Glanton filed this Chapter 11 bankruptcy petition on February 9, 2022.  It is his second filing after a July 2017 Chapter 11 petition in which he listed Luxury Asset Lending, LLC ("LAL") as an unsecured creditor with a claim of $3.2 million, which claim was disputed, unliquidated, and

---

[1] Made applicable to bankruptcy adversary proceedings through Federal Rule of Bankruptcy Procedure 7012.

contingent.[2]  The claim was based upon the Judgment.  Glanton filed a motion to allow voluntary

dismissal of his 2017 Chapter 11 case.  In his certification in support of the motion, he stated that

he had reached a settlement with LAL.[3]  This Court granted Glanton's motion to dismiss in April

2018.

Two months after he filed the current petition, Glanton amended his schedules to add LAL

as a creditor.  On May 20, 2022, counsel entered an appearance on behalf of "Newport Investment

Group, LLC, Assignee of Luxury Asset Lending, LLC".  The creditor name does not distinguish

between Newport CA and Newport MT, nor does it reference an assignment which purportedly

occurred between the two entities.

Shortly after the entry of appearance, Newport CA filed a secured proof of claim in the

amount of $7,186,756.38 based upon the Judgment.  The creditor named on the Proof of Claim is

Newport Investment Group, LLC and makes no distinction as to whether it is the Montana entity

or the California entity.[4]  The supporting documents evidenced only an assignment of the

Judgment from LAL to a Newport entity.  The filing did not contain the subsequent assignment

which purportedly occurred between Newport MT and Newport CA.

When Newport CA entered its appearance, there was a pending motion to convert

Glanton's case filed by another creditor.  Newport CA filed a response to the motion to convert

titled as a cross-motion to appoint a Chapter 11 trustee.  In reality the two motions sought similar

relief.  Glanton, who was represented by counsel at the time, opposed the motions and moved for

dismissal of the case.  He did not raise the issue of Newport CA's standing in his opposition or

---

[2] Bankruptcy Case No. 17-24279(CMG).
[3] *See* Case no. 17-24279, ECF Doc. 54-1, 14(b).
[4] The evidentiary hearing explained the different roles played by the California entity and the Montana entity,
enabling the Court to correctly label the companies in this decision.

motion.  Ultimately, on August 30, 2022, this Court entered an order converting the case to a Chapter 7.  The Chapter 7 trustee has not filed any objection to the Newport CA proof of claim.

Newport CA filed the present adversary proceeding on December 6, 2022.  Glanton, through new counsel, filed an answer on January 27, 2023.  He then filed the present motion to dismiss, as a self-represented debtor, on March 7, 2023.  His counsel subsequently withdrew and Glanton proceeded without counsel.

The parties appeared for oral argument on the motion to dismiss on March 28, April 18 and April 21.  At the April 21 hearing, the Court determined two of Glanton's three arguments in favor of Newport CA and expressed its intention to defer consideration of the third argument until later in the case by reserving its decision.  But, considering that the motion to dismiss, if ultimately granted, would result in a loss of standing for Plaintiff, the Court found it necessary to decide the issues immediately.  The parties were instructed to advise the Court as to their needs for an evidentiary hearing and discovery.  Neither party requested a lengthy discovery period.

The evidentiary hearing was held on May 15, 2023.  Brian Roche testified as the managing member of Newport CA.  Chris Walker, a Montana attorney, also testified at the request of Plaintiff.  Glanton did not call any witnesses.


### The Motion to Dismiss


Glanton filed this motion pursuant to Fed. R. Civ. P. 12(h)(3)[5], which allows for dismissal at any time based upon a lack of subject matter jurisdiction.  Standing is jurisdictional, and a court lacks subject matter jurisdiction over the entire matter if the plaintiff lacks standing at the time of

---

[5] Made applicable in adversary proceedings under Fed. R. Bankr. P. 7012(b).

filing of a complaint.[6]   A court cannot focus on the merits of the cause of action if the court lacks

jurisdiction over the matter.[7]

Further, Fed. R. Civ. P. 12(i) provides that a motion relating to a defense under Rule

12(b)(1)-(7)[8] made on the pleadings under Rule 12(c) must be heard and decided before trial unless

the court orders a deferral.   Additionally, Glanton moves under Fed. R. Civ. P. 17(b)[9] which

requires that an action be prosecuted by the party who holds the right sought to be enforced.

The party requesting judicial resolution of a dispute bears the burden of clearly alleging

facts to demonstrate standing to make the request.[10]   Here, Newport CA's unchallenged proof of

claim is prima facie evidence of standing.[11]   The allegations in the adversary complaint also

demonstrate Newport CA's standing to prosecute the action.   This court must accept as true all

material allegations of complaint, drawing all reasonable inferences therefrom in plaintiff's favor,

unless standing is challenged as factual matter.[12]

In his motion to dismiss, Glanton alleges facts that challenge Newport CA's standing.

Once factually challenged, a motion to dismiss for lack of standing places the burden on the

plaintiff to prove that the required elements of standing are met.[13]   The plaintiff must show that

standing exists by a preponderance of the evidence, or proof to a reasonable probability.[14]

Initially, this Court was hesitant to rule in any capacity on this motion and strongly

considered deferral.   The issues raised herein intertwine with the overall validity of the proof of

claim.   The Chapter 7 trustee is not a party to this adversary proceeding, although he is aware of

---

[6] In re Alvaro, 2005 Bankr. LEXIS 3483 *19 (Bankr. S.D.N.Y. 2005).

[7] See id.

[8] Subject matter jurisdiction applying under R. 12(b)(1).

[9] Made applicable in adversary proceedings under Fed. R. Bankr. P. 7017.

[10] FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 231, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990).

[11] Fed. R. Bankr. Proc. 3001(f).

[12] See In re Reed, 532 B.R. 82, 88 (Bankr. N.D.Ill. 2015).

[13] See id.

[14] See id. at 89

its status.  If Glanton is correct, it is likely that the proof of claim would need to be expunged.  If Newport CA is successful, it likely precludes the Chapter 7 trustee from advancing a similar argument if he should choose to challenge the claim on the same theory.  There are many legal arguments regarding whether a Chapter 7 debtor has standing to object to a proof of claim in a non-surplus case.[15]  While Glanton may not have a pecuniary interest in the allowance or disallowance of the claim, he certainly has an interest in the claim to the extent that Newport CA seeks a determination of its dischargeability.  The Court finds that the question of dischargeability provides Glanton with the pecuniary interest necessary to object to the claim.  His motion to dismiss amounts to his objection.  This does not preclude the Chapter 7 trustee from raising other issues in his own objection to the claim, should he choose to file one.

Ultimately the parties have not briefed any of these complicated legal questions, nor have they objected to the procedural method through which the question of subject matter jurisdiction arose.  Requiring Glanton to re-file a similar motion in the main case objecting to the claim would be redundant and inefficient.

For this reason, the Court will issue a decision.

### Procedural History Regarding the Judgment

In or about Spring 2016 Glanton entered into a loan transaction with LAL[16] through which he pledged his shares in Philadelphia Television Network, Inc. ("PTNI"), a company in which he was the majority shareholder.  He also obligated PTNI on the loan and pledged PTNI's assets as collateral to secure the loan.  Glanton and PTNI defaulted, LAL sued, and on April 6, 2017, the

---

[15] A non-surplus case is considered to be one in which there are insufficient assets to pay all creditors, leaving no possibility that the debtor will receive a distribution.
[16] Roche held an interest in LAL.

Superior Court of the State of California (the "California Court") entered a default judgment in favor of LAL in the amount of $3,897,919.22, jointly and severally, against Glanton and PTNI (previously defined as the "Judgment").[17]

A year after the Judgment entered, an "Acknowledgment and Assignment of Judgment" was filed in the California Court (the "Judgment Assignment"). The purpose of the Judgment Assignment was to settle a dispute between Roche, then a member of LAL, and the other members of LAL. The document evidences an assignment of all LAL's right, title and interest in the Judgment to Newport Investment Group, LLC with an address in Las Vegas, Nevada. Roche testified that he signed the Judgment Assignment as managing member of Newport MT, the assignee.

Within days of the docketing of the Judgment Assignment, Newport MT and Glanton, individually and purportedly on behalf of PTNI, entered into a Stipulation for Assignment Order (the "Assignment Order") which was docketed in the California Court on April 30, 2018. The Assignment Order transferred Glanton's interests in PTNI to Newport MT contingent on FCC approval. The Assignment Order further noted that Newport MT agreed to the dismissal of Glanton's prior bankruptcy in consideration for the transfer. Finally, the Assignment Order additionally transferred full ownership and control of PTNI to Newport MT. This included a broadcast license owned by PTNI. The stipulation between the parties was so ordered by the California Court.

Approximately a year after entry of the Judgment Assignment and Assignment Order, PTNI moved to set aside the Judgment. The background and reasoning behind this motion are set forth in the California Court of Appeal decision of <u>LAL v. Philadelphia Television Network, Inc.</u>

---

[17] Another party, Wayne Curtis Weldon, was also named as a defendant in the action and LAL obtained a judgment of $295,104.70 against him. He later reached a separate agreement with LAL and is not involved in this case.

(the "Luxury Decision").[18]    Summarily, PTNI complained that it had no knowledge of the loan made by LAL or of the collection action in the California Court.  PTNI alleged that Glanton acted on behalf of PTNI beyond his authority, and that the other parties, including Roche and LAL, failed to provide PTNI with any notice of the lawsuit.  PTNI noted that notice of all pleadings were served on Glanton directly and never to PTNI's registered address.  As a result of the default Judgment and Assignment Order, PTNI stood to lose it license and assets.

The Luxury Decision instructed the trial court to "vacate the default, default judgment and [Assignment Order]."  The trial court held a status conference with LAL and PTNI (not Roche or Glanton) and entered a "Minute Order" which stated that based upon the Luxury Decision the court "vacates the default judgment as to [PTNI], vacates the default as to [PTNI] and vacates the assignment to [Newport]."  Finally, it set dates by which LAL could amend its complaint to substitute Newport CA as plaintiff and the defendant could file its answer and noted that "[t]he parties can submit a motion to sever the defendants."  The trial court ordered PTNI to give notice of its decision.

PTNI filed a "Notice of Ruling at Status Conference" (the "Notice"), which was entered on the docket, repeated the entries in the Minute Order, and set a date by which PTNI (not Glanton) had to file its answer to LAL's complaint.  The Notice explicitly stated, "the Court declined to take any action at severing the April 2017 Judgment as it effects individual defendant Richard Glanton but will consider the issue as necessary upon properly noticed motion."

Thereafter, Newport CA filed an amended complaint which in its request for relief sought "[t]hat the Defendants be severed such that separate judgments may be entered in the case under the one judgment rule since the Judgment against Glanton is in full force and effect."  At some

---

[18] Luxury Asset Lending, LLC v. Philadelphia Television Network, Inc., (2020) 56 Cal.App.5th 894.

point in early 2023, Glanton filed a motion in the California trial court seeking to clarify that the Judgment was void as to him based upon similar legal theories as to those presented to this Court in his motion to dismiss, which theories are discussed below.  Newport CA filed opposition, and the California trial court issued a tentative decision in which it noted Glanton's pending bankruptcy and adjourned the matter to consider the jurisdictional issues effected by his bankruptcy filing. Glanton subsequently withdrew his motion in the California trial court and continued with his motion to dismiss the adversary proceeding in this Court.

### Analysis of Glanton's Theories Supporting Dismissal of the Adversary Proceeding

(i) The Luxury Decision Vacated the Judgment as to Glanton

Glanton relies on the Luxury Decision to support his claim that it not only vacated the Judgment against PTNI, but also vacated the Judgment as to him.  He cites to the provision of the Luxury Decision where the California Court instructs the trial court to "vacate the default, default judgment and [A]ssignment [O]rder."  He contends that this invalidates the Judgment and all assignments, including the assignment of his individually held stock.

This argument is wholly unsupported by an examination of the Luxury Decision.  PTNI was the only party moving to vacate default.  Glanton took no part in the motion to vacate.  The introductory portion of the Luxury Decision makes clear what the California Court thought of Glanton and Roche:

> [Glanton] offered as collateral assets which were not [his] to encumber.  [PTNI] had no idea they were being encumbered.  And [Roche and his affiliate LAL were other] investors in the scam intent not only on recouping [their] investment, but willing to take as much flesh and scorch as much earth as necessary to do so, all the while waiving a default judgment [against PTNI] as a cudgel.[19]

---

[19] *See* LAL v. PTNI, 56 Cal. App. 5 894, 898 (2020).

The California Court noted that Roche and LAL engaged in deceptive tactics as to PTNI.[20]  "LAL and Roche failed to send notice of the lawsuit, default, and judgment to PTNI's registered address, serving only Glanton, whom they knew not to be trustworthy."[21]  Even when PTNI and Roche were communicating directly, Roche never informed PTNI of the entry of the default judgment against it.[22]  Despite this direct communication, Roche and LAL continued to send notices only to Glanton.[23]  Nowhere in the Luxury Decision does the California Court raise any concern that Glanton did not receive notice or that Glanton was misled as to the entry of the Judgment.

The California Court granted PTNI's requested relief based largely on the actions of Roche and Glanton.  The Luxury Decision was based on the equities of the case: primarily that Glanton exceeded his authority on behalf of PTNI, and that by serving Glanton instead of PTNI the entity was deprived of proper notice.  It is completely illogical, then, that Glanton would be rewarded for his behavior by being relieved of a default judgment against him, particularly because he did not even seek that relief.  The Judgment was joint and severable.  Glanton has provided no authority whereby the vacation of the Judgment as to PTNI would have any effect on the Judgment as to him.

Second, it is clear that the Luxury Decision vacates the April 30th Assignment Order, not the April 27th Judgment Assignment.  The California Court explicitly stated as much when it said "[t]he order denying the motion to vacate default judgment is reversed and remanded with instructions for the trial court to vacate the default, default judgment and assignment order entered April 30, 2018."  The Assignment Order directly affected PTNI's rights in that it ordered the

---

[20] *See* id. at 912-13.
[21] *See* Id. at 912-13.
[22] *See* Id. at 913.
[23] *See* id.

transfer of its assets to Newport MT. That was the harm which the California Court sought to remedy. It did not order vacation of the Judgment Assignment (from LAL to Newport MT). Nor did it need to: the Judgment was vacated as to PTNI, and because the Judgment was joint and severable, it still existed as to Glanton.

To the extent the Luxury Decision may be read as leaving the effect of the Judgment as to Glanton unclear, the trial court's follow-up adds clarity. The Minute Order shows that the trial court understood the Luxury Decision vacated the Judgement as to PTNI, not Glanton. While there were references to vacating an assignment, it is clear when read in conjunction with the Luxury Decision that it is speaking to the Assignment Order, not the Judgment Assignment. There were no proofs presented that could lead to any other conclusion.

Glanton also appears to argue that Plaintiff had an affirmative duty to file something to ensure that the Judgment remained as to Glanton. He apparently relies on the references in the Minute Order and the Notice regarding a motion to sever that may be filed in the future. But it is unclear how he reaches that conclusion. He was not a party to the status conference held by the trial court and has no personal knowledge of what happened. The fact that the Judgment was joint and several directly contradicts his argument. The amended complaint filed by Newport CA acknowledged the issue and acknowledged that the Judgment against Glanton was still in full force and effect.

The Court finds that the Judgment is valid and in full force and effect as against Glanton.[24]

---

[24] Glanton raised challenges to the loan made by LAL in this Court. For example, he alleged his signature was forged on certain loan documents. This Court gives the Judgment full faith and credit here. Based on the doctrines of Collateral Estoppel, Res Judicata and Rooker-Feldman, any challenges of the sort raised by Glanton should have been made to the trial court They will not be entertained by this Court.

(ii)   <u>Even if the Judgment is Valid as to Glanton, Newport MT Could Not Be the
Assignee of the Judgment</u>

Newport MT was subject to a February 24, 2018 Montana Notice of Involuntary
Dissolution ("Notice of Dissolution").[25]  The Notice of Dissolution stated that Newport MT failed
to file an annual report and resultingly the entity "forfeit[ed] its right to carry on business within
the state."  The matter was resolved on December 10, 2018, when Newport MT was reinstated by
the Montana Secretary of State.[26]  Since the Judgment Assignment occurred in April 2018, during
the period in which Newport MT had "forfeited its right to carry on business within the state,"
Glanton argues that Newport MT was unable to accept the Judgment Assignment.  Therefore,
according to Glanton, the assignment is void.

Montana law applicable to corporate dissolution and reinstatement is found in sections 35-
8-209 & 912 of the Montana Code.  Section 209 speaks to the authority of the secretary of state to
dissolve a company involuntarily for failure to comply with administrative requirements, including
the failure to file annual reports as Roche testified was the case here.  Section 912 relates to
reinstatement following administrative dissolution.  The statute provides a mechanism for a
company which has been administratively dissolved to reapply for reinstatement.

Section 912(5) speaks directly to the authority of the corporation to act during the period
of dissolution.  That section explicitly provides that "restoration of limited liability company rights
pursuant to this section relates back to the date the limited liability company was administratively
dissolved, and the limited liability company is considered to have been an existing legal entity
from the date of its original organization."

---

[25] Defendant Exhibit 3A.
[26] Defendant Exhibit 3C.

Glanton attaches this very section in his filings yet, in spite of the plain language of the statute, he argues that because Newport MT was dissolved the Judgment Assignment is of no effect. This position is directly contradicted by subsection 5. It is uncontested that Newport MT was reinstated in December 2018. By state law, it was then considered to be an existing legal entity at the time of the Judgment Assignment. The testimony of Chris Walker, a Montana corporate attorney, supports this conclusion.

Glanton also cites to California state law which requires that a foreign business register to transact business in the state. The registration requires a valid certificate of good standing by the jurisdiction in which the entity is organized. Because Newport MT was not in good standing at the time of the Judgment Assignment, Glanton believes that it could not have been properly registered to conduct business in California, where the Judgment Assignment occurred.

There is no evidence that Newport MT was transacting business in California. The one-time assignment between LAL and Newport MT does not appear to meet the definition for "transacting intrastate business." The California secretary of state website states that "'Transacting intrastate business is defined as entering into repeated and successive transactions of its business in this state, other than interstate or foreign commerce.'"[27] Newport MT does not fit this definition.

The Court finds that Newport MT had the authority to accept the Judgment Assignment from LAL.

    (iii)   <u>Even if the Judgment was Valid as to Glanton and Properly Assigned to Newport MT, the Assignment of the Judgment from Newport MT to Newport CA Is Invalid</u>

Glanton points out that the records of the Montana Secretary of State show a Statement of Dissociation ("Dissociation Statement") dated February 14, 2018, which indicates that Roche was

---

[27] https://www.sos.ca.gov/business-programs/business-entities/faqs.

no longer active in Newport MT.[28]  Roche signed the document transferring the Judgment from

Newport MT to Newport CA (the "Assignment Agreement") on behalf of Newport MT in July

2018, after his dissociation from Newport MT.[29]  Therefore, according to Glanton, Roche did not

have the authority to make the assignment on behalf of Newport MT.

Further, Glanton notes that the Dissociation Statement was signed by Amy Fisher

("Fisher") in her role as "Member/Manager" of Newport MT.  Fisher also signed the Reinstatement

of Newport MT dated December 10, 2018, as Member/Manager.[30]  The Reinstatement noted that

Newport MT was a limited liability company which "has only one member and has elected not to

be taxed as a corporation."  Glanton posits that this statement further proves his argument that

Roche was not a member or manager of Newport MT following his dissociation.

Roche was unable to explain why the report states there is only one member of Newport

MT.  He offered little to explain Fisher's role and seemed to imply she made a mistake in carrying

out whatever administrative duties she had.  Roche argues that the company's operating

agreements control and cannot be altered by filings made with the Secretary of State, at least as to

a judgment creditor like Glanton.[31]

Roche testified that he agreed to dissociate himself from Newport MT because, at the time,

he was involved in a separate transaction to purchase a hotel in Las Vegas which required an FBI

background check.  He testified that his disassociation from Newport MT made that process easier.

In support of his testimony that he was, at all times, associated with Newport MT as

manager, member, or both, and so had authority to sign the Judgment Assignment on its behalf,

---

[28] Defendant Exhibit 3B
[29] Defendant Exhibit 4.
[30] Defendant Exhibit 3.
[31] A distinction can be made when a third party such as a bona fide purchaser for value relies on these filings to support its claims or defenses.  This is discussed later in this decision.

Roche introduced copies of several operating agreements for Newport MT. The original agreement was dated October 7, 2016 (the "Original Operating Agreement").[32] It evidenced Roche's 51% ownership in Newport MT. An entity named G-Force Leadership, LLC ("G-Force") owned the remaining 49%.

On February 14, 2018, the same date as the Dissociation Statement, a "First Amended and Restated Operating Agreement" of Newport MT was executed (the "First Amended Operating Agreement").[33] This agreement evidenced a change in the ownership structure of Newport MT. It listed G-Force with an ownership interest of 50%. The remaining 50% was owned by an individual named Ken Fujii ("Fujii"). No accompanying documents were provided which evidenced consideration for the transfer of Roche's ownership interests or any other agreements between the parties. Nor was the issue developed during Roche's direct testimony or cross-examination. The First Amended Operating Agreement specified under the section entitled "Capital Commitments and Membership Interest" that Roche was the "appointed manager." The subsequent section entitled "Membership Voting" stated that "Brian Roche is and all times the Manager and able to take actions on behalf of the LLC."

A final operating agreement, titled the "Second Amended and Restated Operating Agreement" of Newport MT (the "Second Amended Operating Agreement") was signed on July 18, 2018.[34] In this agreement Roche again was listed as a 51% owner, with Fujii listed as the owner of the remaining 49%. G-Force was no longer listed as an owner. There was no further evidence as to the specifics of the transactions between Roche, G-Force and Fujii which led to the changes in ownership. The Second Amended Operating Agreement continued to contain the

---

[32] Plaintiff Exhibit 7.
[33] Plaintiff Exhibit 8.
[34] Plaintiff Exhibit 29.

language that Roche "is and all time the Manager and able to take actions on behalf of the LLC."

The record does not contain any documents demonstrating that Roche attempted to "reassociate"

himself with the company in the eyes of the Montana Secretary of State, if there is such a thing.

On July 25, 2018, a week after Roche, for lack of a better word, was "reinstated" as a 51%

member of Newport, MT, Newport CA filed for incorporation in California.[35]  The Articles of

Organization filed with California were submitted by Jeanne Zhen ("Zhen") who was listed as

"Assistant Secretary."  The operating agreement ("CA Operating Agreement")[36] lists Roche as

manager with a 51% ownership interest in the entity.  Fujii is listed with a 34% interest, and

"Laguana West, LLC" is listed with a 15% interest.  Immediately after Newport CA was

incorporated, Newport MT assigned the Judgment to Newport CA (the "Newport Assignment").[37]

It does not appear that the Newport Assignment was docketed in the California case, as had been

done with the Judgment Assignment.  It is unclear who the signatories on the Newport Assignment

are, although it appears that Roche signed on behalf of Newport MT as assignee.  The signature

entered on behalf of Newport CA appears to be different than Roche's but is not readable.  The

notation "Managing Member" appears on both signature lines, but neither includes a printed name.

No further information regarding the signatures was elicited at trial.  Glanton has not challenged

Newport CA's formation or authority.

Glanton's most compelling position is with regard to Roche's dissociation from Newport

MT.  This was the Court's primary concern in holding the evidentiary hearing.  Unfortunately,

after the hearing there remains a lack of clarity.

---

[35] Plaintiff Exhibit 31.
[36] Plaintiff Exhibit 34.
[37] Plaintiff Exhibit 30.

The Montana Code provides, at 35-8-805(b)(2), that upon disassociation from an LLC "a member's right to participate in the management and conduct of the company's business terminates, except as otherwise provided in 35-8-903, and the member ceases to be a member . . ." Section 903 speaks to the winding up of the business, which is not applicable here. But, section 803(2)(a) states that any dissociative event "that causes a manager to cease to be a manager with respect to a series of members does not, in itself, cause the manager to cease to be a manager with respect to the limited liability company."

According to Newport CA, the First Amended Operating Agreement controls. That document, while acknowledging Roche no longer had an ownership interest in the entity, evidenced that he maintained his position as manager. The document explicitly acknowledged that he maintained the ability to take actions on behalf of the company. Glanton believes that the operating agreement cannot simply override the clear language of the Montana statute, which states that Roche has no right to participate in the business, nor act on its behalf. He cites to a bankruptcy case from the Eastern District of Virginia which applied similar statutory language regarding dissociation in finding that after dissociation the member is divested of all rights to participate in the management and operations of the company.[38]

Roche's explanation that he dissociated to streamline a background check for another venture was incomplete and provided absolutely no context. Did he dissociate from Newport MT so that the FBI would not have to investigate Newport MT and Roche's association with it? If this were the case, did the FBI know that Roche remained as manager of Newport MT? If the Newport MT operating agreements controlled, rather than the filings with the Montana Secretary of State,

---

[38] In re Garrison-Ashburn, L.C., 253 B.R. 700 (Bankr. E.D. Va. 2000).

why did Newport choose to make a dissociation filing instead of amending the operating agreement to address the FBI background search?

As noted, there was no information provided as to the agreements between Roche and the other owners of Newport MT as to the consideration given for divesting and re-vesting Roche's ownership interest in the entity, or how he was to operate as manager of the company. Throughout these transactions there appears to be a history of sloppy shortcuts which have led to the present issues. For instance, this Court questions why Roche submitted only the Judgment Assignment in support of Newport CA's claim. The Newport Assignment was virtually ignored by Newport CA until such time as Glanton questioned the transactions through this motion. And why do Roche's pleadings not disclose the existence of two limited liability companies with the same name?

Newport CA has labeled itself the assignee of LAL. In its adversary complaint it states that "[o]n April 23, 2018, all right title, and interest in the Judgment was assigned to Plaintiff." Through the course of the evidentiary hearing, we learned that the Plaintiff is Newport CA. In its proof of claim it attaches the Judgment Assignment but not the Newport Assignment. As developed herein, these are not the facts of this case. Newport CA is actually the assignee of Newport MT. Newport CA did <u>not</u> receive anything as of April 23, 2018. Glanton correctly notes that Newport CA did not exist at that time. Under that backdrop the Court is wary of Roche's testimony even before considering the problematic factual history of the underlying transactions, as outlined in the Luxury Decision.

But Federal Rule of Civil Procedure 15(a)(2) provides that the court should freely give leave to amend when justice so requires.[39] "In the absence of any apparent or declared reason-such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure

---

[39]  Made applicable to bankruptcy proceedings through Federal Rule of Bankruptcy Procedure 7015.

deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue

of allowance of the amendment, futility of amendment, etc.—the leave sought should be freely

given."[40]  The Court finds no reason to disallow an amendment and, in light of its findings herein,

holds that justice requires the opportunity to amend the complaint.

On the other hand, Glanton provided absolutely no evidence to contradict Roche's

testimony, nor did he explore the missing pieces.  Glanton's entire legal theory appears to rely

heavily on a certification filed by PTNI in the California case that raised similar issues.  But

Glanton has done nothing to further develop the issues nor did he take advantage of the opportunity

for discovery.  He did not call Fujii, Fisher, Thomas Mackie (representative of G-Force, a member

of Newport MT), or any other individuals with direct knowledge of the transactions who might

testify as to Roche overstepping his authority.

Glanton was not a party to these transactions.  Nor does he have any interest in the

underlying assignments.  This is where the matter at bar is distinguishable from the caselaw cited

by Glanton regarding dissociation.  In those cases, other members of the corporation challenged a

dissociated member's rights to act on its behalf.  The other members were directly aggrieved.

Here, there is no one from Newport MT, Newport CA, or LAL who has testified to state that the

transactions were not authorized by the company.  The First Amended Operating Agreement of

Newport MT makes clear that, whatever the effect of dissociation, it was the intention of the

members that Roche continue to manage Newport MT.

Section 35-8-811 of the Montana Code adds context to this issue.  It states:

> For 2 years after a member dissociates without the dissociation resulting in
> a dissolution and winding up of a limited liability company's business, the
> company, including a surviving company under part 12 of this chapter, is

---

[40] <u>Cusamano v. Sobek</u>, 604 F. Supp. 2d 416, 506 (D.N.D.N.Y. 2008), *citing* <u>Foman v. Davis</u>, 371 U.S. 178, 182, (1962).

bound by an act of the dissociated member that would have bound the
company under 35-8-301 before dissociation only if at the time of entering
into the transaction the other party:

(1)   reasonably believed that the dissociated member was then a
member;
(2)   did not have notice of the member's dissociation; and
(3)   is not considered to have had notice under 35-8-812.

The statute actually allows for a dissociated member to bind a company, unless the
counterparty can demonstrate that it was unaware.  In this case there is no evidence that the
counterparties (LAL, the other members of Newport MT, and then Newport CA) have any issue
with the underlying transaction.  It does not make sense that a state statute regarding dissociation
would trump the actual intention of the parties who would be most affected by dissociation: the
members.

The testimony of Mr. Walker was not helpful to the Court on this issue.  He testified that a
dissociated member could, in certain circumstances, act on behalf of the company.  But he agreed
with Glanton that there is a concern that third parties may be confused by filings with a secretary
of state as to who is acting with legal authority.  Walker did not appear to be familiar enough with
the facts of this case to testify that, as to the assignment of the Judgment from Newport MT to
Newport CA, Roche had authority.  The Court relies on the Montana statute quoted above that
protects third parties for at least two years after dissociation by a member.  More importantly,
Glanton, as a judgment debtor subject to a collection action, does not appear to be the type of third
party the statute is intended to protect.  Roche provided sufficient proof that his dissociation from
Newport MT did not prevent him from executing an assignment of the Judgment to Newport CA.

This Court finds that there are no grounds to disturb the Judgment Assignment or the
Newport Assignment.

**<u>CONCLUSION</u>**

For these reasons, Glanton's Motion to Dismiss is DENIED.    Newport CA has ten days

from the date of the entry of this decision to amend its complaint to reflect the facts as described

in Roche's testimony.


Dated:  July 7, 2023

<u>/s/Christine M. Gravelle</u>
United States Bankruptcy Judge